## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CE LINE ONE CORPORATION LIMITED f/k/a FIVE OCEAN'S TRADING ASIA LIMITED, and DIPTSY MOLINA,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>DARREN NEIL MASTERS, JONATHAN CHARLES GOLDSTEIN, and JONATHAN C. GOLDSTEIN P.C.,<br><br>　　　　Defendants. | **CIVIL ACTION**<br><br>**No. 1:24-cv-09889**<br><br>**COMPLAINT**<br><br>**TRIAL BY JURY DEMANDED** |

Plaintiffs CE Line One Corporation Limited, f/k/a Five Ocean's Trading Asia Limited ("CE Line"), and Diptsy Molina ("Molina"), for their Complaint against Defendants Darren Neil Masters ("Masters"), Jonathan Charles Goldstein ("Goldstein"), and Jonathan C. Goldstein P.C. ("Goldstein P.C."), allege as follows:

## PARTIES, JURISDICTION, AND VENUE

1.　　　Plaintiff CE Line is a company incorporated in Hong Kong. Its principal place of business is located at 92 Siena Avenue, LG-01, Office Block 1, DB North Plaza, Discovery Bay, Lantau Island, Hong Kong. CE Line's business purpose is to manage Molina's assets.

2.　　　Plaintiff Molina is a citizen of Greece and the ultimate beneficial owner of CE Line, and is domiciled in Marbella, Spain.

3.　　　Defendant Masters is a resident of Florida, and is otherwise *sui juris*. Master's last known address is 434 Trade Winds Avenue, Naples, Florida 34108.

4.    Defendant Goldstein is a resident of New York, and is otherwise *sui juris*. He is a New York-licensed attorney, and his last known address is 66 Madison Avenue, Apartment 6H, New York, New York 10016.

5.    Defendant Goldstein P.C. is a New York law firm, with principal place of business at 66 Madison Avenue, Apartment 6H, New York, New York 10016.

6.    Goldstein P.C. is Goldstein's alter-ego. Goldstein is the sole owner and decision-maker at the law firm, and no other attorneys work with him.

7.    Goldstein and Goldstein P.C. are collectively referred to herein as the "Goldstein Defendants."

8.    This Court has personal jurisdiction over Masters pursuant to Federal Rule of Civil Procedure 4(k)(1). Specifically, Masters contracted for and utilized escrow services in New York to commit tortious acts damaging Molina. *See* N.Y. C.P.L.R. § 302(a)*; Nick v. Schneider*, 56 N.Y.S.3d 210, 214 (N.Y. App. Div. 2017).

9.    Masters has sufficient contacts with New York such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice. Masters contracted the escrow services of a New York attorney, and used that New York-based escrow account to receive and transfer monies to third parties. Furthermore, Masters committed wrongful conduct against CE Line and Molina in New York, using New York services.

10.    Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(a), as this is an action for damages exceeding $75,000.00, excluding interest, costs, and attorney's fees, and there is complete diversity among the parties.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), and (2). The Goldstein Defendants reside in this District, and a substantial part of the events giving rise to the action occurred in this District.

## FACTUAL ALLEGATIONS

A.     **Masters'** *Modus Operandi.*

12.     Masters is a career fraudster whose *modus operandi* involves enticing potential victims to invest assets with him by holding himself out as a qualified solicitor of the United Kingdom, and as an experienced asset planner and investor. He lures his victims by promising lucrative investment plans with extremely attractive returns.

13.     Once victims fall into Masters' trap and transfer funds to him, he surreptitiously moves the funds away from his victims' reach. Masters quickly dissipates the assets for his own personal benefit, such as by pursuing personal business ventures, acquiring property, or settling his personal debts.

14.     Masters owns and/or controls multiple business entities which he uses as shell companies to conceal and dissipate his victims' assets. These include SCP SN Advisory, SN SCP LLC, Granite Investment Global BVI, and BBMR Consulting (the "Masters Entities").

15.     Once Masters' victims realize that something is amiss and request the return of their funds, Masters orchestrates lies and excuses to buy as much time as possible. At this point, victims may give up in frustration.

16.     Masters' pattern of fraud has enabled him to enjoy a lavish lifestyle at the expense of his victims, indulging in luxuries like yachts and upscale properties in Florida and Monaco.

**B.      Masters Entraps Molina in His Fraudulent Scheme.**

17.      On or about November 4, 2022, Diego Marmol Rojo ("Marmol"), a long-time acquaintance of Molina, introduced her to Masters. Masters presented Molina and Marmol with an opportunity to invest in a "high yield" project (the "Project") involving an entity known as the "Surfside Trust" or "Surfside Structure."

18.      Masters assured Molina, both orally and in writing, that she would have complete control of any funds she invested into the Project, and that the Project would provide her with a 12% weekly return to be deposited into a separate account in her name.

19.      During his interactions with Molina, Masters claimed to be a qualified British solicitor and expert asset planner, and he continues to do so through the website of SN Advisory.[1]

20.      Masters does not appear as a licensed solicitor on the register of the Solicitors Regulation Authority ("SRA"), which is the regulatory body for all solicitors in England and Wales.[2]

21.      Based on Masters' representations about himself and the Project, she agreed to transfer $11,500,000.00 for investment in the Project.

22.      Masters represented to Molina that he was still working on setting up a bank account for the Project and, accordingly, caused her to retain the British law firm 7 Legal and Finance Limited ("7LF") to receive and manage her funds for the Project.

---

[1] *See* SN Advisory, Our Team, https://www.snadvisory.com/team (last visited Dec. 16, 2024).

[2] *See* SRA Solicitor's Register, https://www.sra.org.uk/consumers/register/ (last visited Dec. 16, 2024).

23.    The SRA regulated 7LF as an alternative business structure until it revoked 7LF's practicing certificate on December 9, 2022,[3] thereby preventing 7LF from acting as a solicitor firm in England and Wales.[4]

24.    7LF continues to operate as an entity engaged in non-legal matters, with its principal place of business at the John Banner Centre, 620 Attercliffe Road, Sheffield, England, S9 3QS.[5]

25.    Following Masters' instructions, Molina had CE Line (formerly known as Five Oceans) transfer her funds to 7LF as an investment in the Project.

26.    Jeremy Bennett ("Bennett"), a licensed solicitor and partner at 7LF, was in charge of CE Line's affairs at the law firm.

27.    On information and belief, Bennett acted pursuant to Masters' instructions at all times relevant to this action.

28.    Between November 15 and November 22, 2022, CE Line sent three wire transfers to 7LF's bank account with Santander UK PLC, totaling $11,300,000.00 (the "Subject Funds"):

| Transfer Date: | Transfer Amount: |
| --- | --- |
| November 15, 2022 | $2,000,000.00 |
| November 17, 2022 | $3,000,000.00 |
| November 22, 2022 | $6,300,000.00 |
| **Total:** | **$11,300,000.00** |

---

[3] An alternative business structure is a firm with non-lawyers in its ownership and management.

[4] *See* SRA Solicitor's Register, 7 Legal and Finance Limited, https://www.sra.org.uk/consumers/register/organisation/?sraNumber=653902&prevSearchText=7%20legal%20and%20finance&prevSearchFilter= (last visited Dec. 16, 2024).

[5] *See* Companies House, 7 Legal and Finance Limited, Overview, https://find-and-update.company-information.service.gov.uk/company/11460060 (last visited Dec. 16, 2024).

29.    Masters provided Molina with records confirming 7LF's receipt of the Subject Funds. Reviewing these records, Molina observed that the processing of each wire transfer had been significantly delayed by Santander UK PLC. In particular, 7LF received the first wire transfer on November 21, 2022; the second, on November 30, 2022; and the third, on December 6, 2022.

**C.    Molina Requests the Return of the Subject Funds.**

30.    On December 13, 2022, concerned about the delays in the processing of her wire transfers to 7LF, and Masters' delay in setting up the bank account for the Project, Molina asked Masters to return the Subject Funds.

31.    On December 20, 2022, creating the appearance that he would comply with Molina's request for the return of her Subject Funds, Masters produced a record reflecting that $5,840,000.00 had been remitted to one of Molina's bank accounts. However, such transfer never occurred.

32.    After Molina confronted Masters about the $5,840,000.00 wire transfer, Masters emailed her on December 21, 2022 indicating that the wire transfer had been canceled and he had made other arrangements to return the funds. In fact, Masters again provided Molina with a false wire confirmation stating that $2,480,000.00 had been remitted to Molina's account.

**D.    7LF Transfers Molina's Funds to Goldstein.**

33.    In reality, between December 1, 2022 and December 8, 2022, unbeknownst to Molina, 7LF transferred the Subject Funds to Goldstein P.C. More specifically, 7LF transferred Molina's funds to Goldstein P.C.'s escrow account at Citibank:[6]

---

[6]    The last four digits of this bank account are 2197.

| Transfer Date: | Transfer Amount: |
| --- | --- |
| December 1, 2022 | $1,599,950.00 |
| December 5, 2022 | $6,249,950.00 |
| December 8, 2022 | $3,013,862.01 |
| **Total:** | **$10,863,762.01** |

34.     7LF retained $436,237.99 from the Subject Funds, presumably as their share for assisting Masters in the scheme.

35.     On information and belief, 7LF transferred the $10,863,762.01 at Masters' direction.

36.     Molina never authorized the transfer of her funds from 7LF to Goldstein P.C. In fact, she was never advised by 7LF that these funds had been transferred elsewhere. Molina first became aware through Marmol that 7LF had transferred all or part of the Subject Funds to Goldstein P.C.

37.     On January 5, 2023, Masters emailed Molina assuring that "the funds will be released within the next couple of days."

38.     On January 19, 2023, Goldstein emailed Molina's counsel at the law firm of Horowitz and Rubenstein, LLC ("H&R"), stating that he was holding the funds "in escrow" for Masters, and would contact Masters for instructions.

39.     On January 31, 2023, Goldstein emailed H&R, advising that Masters had authorized the disbursement of the funds to Molina. Moreover, Goldstein provided H&R with a copy of a "Disbursement Form," purportedly instructing Goldstein to transfer the Subject Funds to H&R's IOLA account. However, neither H&R nor Molina received the Subject Funds.

40.    Between February 2, 2023, and February 22, 2023, Masters and Goldstein repeatedly and falsely emailed Molina assuring that the Subject Funds would be returned to her:

      a.    On February 2, 2023, Masters emailed Molina claiming that the Subject Funds would be returned, saying that he "instructed the funds to move and they will, it is frustrating but it will be completed."

      b.    On February 3, 2023, Masters again assured Molina that "once Mr. Goldstein is able to remit the settled funds he will immediately do so."

      c.    On February 9, 2023, Masters insisted to Molina that "the funds will come to [Molina] once they are released."

      d.    On February 14, 2023, Goldstein wired $100,000.00 to H&R's IOLA account, purportedly as a "test payment" to Molina.

      e.    On February 16, 2023, Goldstein emailed H&R claiming that the remaining Subject Funds "will be wired as soon as they are free."

      f.    On February 22, 2023, Masters once again assured Molina that the Subject Funds would be sent, saying, "I know there are free funds let me speak to Goldstein as he is probably waiting for all the funds to be available to send."

41.    To date, neither CE Line nor Molina have received the remainder of the Subject Funds.

**E.    Molina Discovers that Masters and Goldstein Dissipated the Subject Funds**

42.    On November 28, 2023, CE Line initiated an application pursuant to 28 U.S.C. § 1782 for an order authorizing discovery from Citigroup, Inc. and the corporate representative of Goldstein, P.C., by means of subpoenas served pursuant to Rule 45 of the Federal Rules of Civil Procedure (the "1782 Application").

43.    As a result of the 1782 Application, Molina learned that, between December 1 and 8, 2022, 7LF transferred $10,863,762.01 of the Subject Funds to Goldstein P.C.'s bank account with Citibank. Furthermore, Molina learned that Masters used the $10,863,762.01 to pay for his own personal and business ventures.

44.    Specifically, Masters used the $10,863,762.01 for the purchase of a property at 434 Trade Winds Avenue, Naples, Florida 3410. For that purpose, Goldstein transferred $5,380,000.00 of the Citibank account to the bank accounts of Pennsylvania entity PCN Network, LLC, and Florida entity VidClose, Inc. on December 7, 2022.

45.    Additionally, after receiving the $10,863,762.01, Goldstein made the following wire transfers at the direction of Masters:

      a.    On December 1, 2022, Goldstein transferred $500,000.00 to Brett Levy, Chairman of Infiniti Wealth Consultancy, Ltd, a British company, for the digitization of certain assets.

      b.    On December 5, 2022, Goldstein transferred $3,150,000.00 to Keystone Legal Solutions, LLC, a Pennsylvania company, in relation to a loan that Masters received from Trex Asia International Limited.

      c.    On December 5, 2022, Goldstein transferred $100,000.00 to Ideal Pacific Management Group, LLC, an Idaho company.

      d.    On December 5, 7, and 9, 2022, Goldstein made three transfers of funds to Granite Investment Global, one of the Masters Entities, totaling $325,000.00.

      e.    On December 9, 2022, Goldstein transferred $100,000.00 to Martin Milburn, an individual in Wales, United Kingdom.

f.  On December 16, 2022, Goldstein transferred £120,000.00 to Alan Rees, a principal at BBMR Consulting, one of the Masters Entities, in relation to a loan that Masters received from Trex Asia International Limited.

g.  On January 25, 2023, Goldstein transferred $36,000.00 to Lindsay & Allen, PLLC, a Florida law firm, to pay for Masters' legal fees and/or expenses.

h.  On or about April 6, 2023, Goldstein transferred $10,000.00 to CEO Council, LLC, a Pennsylvania company, as an "advance fee" regarding the acquisition of a pharmaceutical company.

i.  On April 18, 2023, Goldstein transferred €200,000.00 to Eurolegalitas, Ltd., a British company, as a "commitment fee" for a corporate acquisition.

46.  On information and belief, Goldstein conducted the above wire transfers in connection with Masters' personal business ventures or liabilities.

47.  The records obtained in connection with the 1782 Application also reveal that Goldstein did not conduct any due diligence on Masters, his business activities, or the wire transfers Masters instructed him to carry out. Goldstein blindly complied with all of Masters' instructions.

48.  Goldstein never inquired with Masters on why he had received $10,863,762.01 from 7LF until H&R contacted him on behalf of Molina. This was the first time that Goldstein received money from 7LF.  Moreover, this was the first time that Goldstein received a wire transfer in an amount over one million dollars.

49.  Goldstein P.C. did not have a compliance program, nor any written policies, procedures, or controls to detect and deter fraud.

50.     Before bringing Masters on as his client, Goldstein had never provided escrow services.

51.     Despite Molina's efforts to resolve the dispute without court action, neither Masters nor the Goldstein Defendants have returned the missing $11,200,000.00. This amount represents the $11,300,000.00 Molina initially wired to 7LF, minus the $100,000.00 Goldstein wired to H&R on or about February 14, 2023.

52.     The Defendants' actions deprived Plaintiffs of access to the Subject Funds and their use.

53.     Masters no longer owns the property located 434 Trade Winds Avenue, Naples, Florida, 3410.

54.     Plaintiffs have retained undersigned counsel and are obligated to pay them a reasonable fee.

55.     All conditions precedent to this action have been performed, excused, or waived.

## COUNT I – BREACH OF FIDUCIARY DUTY
### (Against Masters)

56.     Plaintiffs re-allege paragraphs 12 to 55 as if set forth fully herein.

57.     Molina placed her trust in Masters by holding him responsible with the managing and investing of the Subject Funds.

58.     Masters owed Molina certain fiduciary duties, including the duties of care, loyalty, and good faith.

59.     Masters breached his fiduciary duties to Molina by:

    a.  Inducing Molina to wire Molina's funds to 7LF based on false pretenses.

    b.  Failing to invest Molina's funds as promised by Masters.

    c.   Causing Molina's funds to be transferred from 7LF to Goldstein's escrow account without authorization.

    d.   Causing Goldstein to dissipate Molina's funds for Master's personal benefit.

    e.   Refusing and delaying the return of Molina's funds upon request.

    f.   Concealing the dissipation of Molina's funds from her.

    g.   Deceiving Molina about his true intentions to use Molina's funds for his own purposes.

60.    As a result of Masters' actions, Plaintiffs have suffered damages of no less than $11,200,000.00.

## COUNT II – FRAUD
### (Against Masters)

61.    Plaintiffs re-allege paragraphs 12 to 55 as if set forth fully herein.

62.    Masters made multiple misrepresentations to Molina, including the following:

    a.   Falsely presented himself to Molina as a qualified UK solicitor and skilled asset planner and investor.

    b.   Stated to Molina that he would invest the Subject Funds in the Project.

    c.   Asserted that Molina would have total control of the Subject Funds, and that the returns would be paid to Molina.

    d.   Represented that 7LF would receive the funds in escrow as part of Molina's investment into the Project.

63.    At the time Masters made the above-mentioned misrepresentations, he knew them to be false. He made them with the intent to deceive Molina and induce her to transfer the Subject Funds to him and/or entities under his control.

64.    Masters made the above-mentioned misrepresentations via emails from his email address (neil.masters@snadvisory.com) to Molina's email address (diptsy8285@gmail.com), as well as during telephone calls with Molina, including calls from Masters' cell phone to Molina's cell phone.

65.    Molina was unaware of Masters' wrongful intentions. Molina believed the representations about him and the Project to be true, relied on them, and was thereby induced to transfer the Subject Funds to 7LF.

66.    Had Molina known the truth about Masters and the Project, she would not have transferred the Subject Funds to 7LF.

67.    Masters acted on his true intentions. He caused 7LF to transfer the funds to Goldstein, and instructed him to use the funds for Masters' own benefit.

68.    As a result of Masters' actions, Plaintiffs have suffered damages of no less than $11,200,000.00.

<u>**COUNT III – UNJUST ENRICHMENT**</u>
**(Against Masters)**

69.    Plaintiffs re-allege paragraphs 12 to 55 as if set forth fully herein.

70.    By receiving Molina's funds and using them to pay his personal ventures, Masters received a benefit from Molina.

71.    Masters voluntarily accepted and retained the benefit he received from Molina. He caused 7LF to transfer the funds to Goldstein, and then instructed Goldstein to execute multiple unauthorized transactions using Molina's funds for his own benefit, including the purchase of a residence and the settlement of personal debts.

72.    To this date, Masters has not returned the missing $11,200,000.00 to Molina.

73.    Molina never authorized Masters to take her funds and use them for his personal ventures.

74.    The circumstances are such that it would be inequitable for Masters to retain the benefit derived from Molina's funds.

### COUNT IV – CONVERSION
**(Against All Defendants)**

75.     Plaintiffs re-allege paragraphs 12 to 55 as if set forth fully herein.

76.    Defendants interfered with Molina's property by using the Subject Funds for Masters' benefit.

77.    The Defendants' interference with Molina's property was without lawful justification and deprived her of at least $11,200,000.00.

78.    Molina was and continues to be the owner of the missing $11,200,000.00, and is entitled to their immediate possession.

79.    As a result of Defendants' actions, Plaintiffs have suffered damages of no less than $11,200,000.00.

### COUNT V – FRAUDULENT CONVEYANCE
**(Against All Defendants)**

80.    Plaintiffs re-allege paragraphs 12 to 55 as if set forth fully herein.

81.    Under New York law, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276.

82.     A "fraudulent conveyance" by the debtor can be reached by the creditor, allowing the creditor to "disregard the conveyance and attach or levy execution upon the property conveyed." N.Y. Debt. & Cred. Law § 278(1)(a).

83.     On November 22, 2022, Molina transferred the Subject Funds to 7LF as per Masters' instructions.

84.     Molina transferred the Subject Funds to 7LF with the understanding that Masters would invest them into the Project and provide her with a 12% weekly return.

85.     Instead of investing the Subject Funds as promised, Masters caused 7LF to transfer them to Goldstein without informing Molina.

86.     Masters then instructed Goldstein to dissipate Molina's funds in various conveyances, including:

   a.     On December 1, 2022, Goldstein transferred $500,000.00 to Brett Levy, Chairman of Infiniti Wealth Consultancy, Ltd, a British company, for the digitization of certain assets.

   b.     On December 5, 2022, Goldstein transferred $3,150,000.00 to Keystone Legal Solutions, LLC, a Pennsylvania company, in relation to a loan that Masters received from Trex Asia International Limited.

   c.     On December 5, 2022, Goldstein transferred $100,000.00 to Ideal Pacific Management Group, LLC, an Idaho company.

   d.     On December 5, 7, and 9, 2022, Goldstein made three transfers of funds to Granite Investment Global, one of the Masters Entities, totaling $325,000.00.

e.     On December 9, 2022, Goldstein transferred $100,000.00 to Martin Milburn, an individual in Wales, United Kingdom.

f.     On December 16, 2022, Goldstein transferred £120,000.00 to Alan Rees, a principal at BBMR Consulting, one of the Masters Entities, in relation to a loan that Masters received from Trex Asia International Limited.

g.     On January 25, 2023, Goldstein transferred $36,000.00 to Lindsay & Allen, PLLC, a Florida law firm, to pay for Masters' legal fees and/or expenses.

h.     On or about April 6, 2023, Goldstein transferred $10,000.00 to CEO Council, LLC, a Pennsylvania company, as an "advance fee" regarding the acquisition of a pharmaceutical company.

i.     On April 18, 2023, Goldstein transferred €200,000.00 to Eurolegalitas, Ltd., a British company, as a "commitment fee" for a corporate acquisition.

87.     Neither Masters nor Goldstein obtained Molina's authorization to conduct the above-mentioned conveyances. In fact, they never informed Molina of the above-mentioned conveyances.

88.      When pressed to return the funds to her, Masters and Goldstein falsely assured her and doctored documents to reflect that the funds were being returned.

89.     The above-described conveyances were executed with the intent to hinder, delay, and defraud Molina.

90.      As a result of Defendants' actions, Plaintiffs have suffered damages of no less than $11,200,000.00.

## COUNT VI – CIVIL CONSPIRACY
### (Against All Defendants)

91.     Plaintiffs re-allege paragraphs 12 to 55 as if set forth fully herein.

92.    Under New York Law on civil conspiracy, a party can establish the vicarious liability of co-conspirators for each other's offenses. *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 610 (S.D.N.Y. 2011).

93.    Masters on one side, and the Goldstein Defendants on the other, entered into an express or implied agreement among themselves to unlawfully defraud Molina.

94.    Masters performed one or more overt acts in furtherance of the conspiracy, as more specifically alleged above, including but not limited to:

    a.    Falsely presented himself to Molina as a qualified UK solicitor and skilled asset planner and investor.

    b.    Stated to Molina that he would invest the Subject Funds in the Project.

    c.    Asserted that Molina would have total control of the Subject Funds, and that the returns would be paid to Molina.

    d.    Represented that 7LF would receive the funds in escrow as part of Molina's investment into the Project.

    e.    Caused 7LF to transfer the funds to Goldstein without notifying Molina.

    f.    On February 2, 2023, Masters emailed Molina advising that the Funds would be returned, saying that he "instructed the funds to move and they will, it is frustrating but it will be completed."

    g.    On February 3, 2023, Masters again assured Molina that "once Mr. Goldstein is able to remit the settled funds he will immediately do so."

    h.    On February 9, 2023, Masters insisted that "the funds will come to [Molina] once they are released."

i.    On February 22, 2023, Masters once again assured Molina that the funds would be sent, saying, "I know there are free funds let me speak to Goldstein as he is probably waiting for all the funds to be available to send."

95.    Goldstein, on his own behalf and on behalf of Goldstein P.C., performed one or more overt acts in furtherance of the conspiracy, as more specifically alleged above, including but not limited to:

a.    Entering into an escrow agreement with Masters and the Masters Entities. Pursuant to this agreement, Goldstein agreed to conduct any transfers of money from the funds deposited into the Citibank escrow account as instructed by Masters.

b.    Receiving and retaining the $10,863,762.01 that 7LF wired to the Citibank escrow account between December 1 and 8, 2022.

c.    Using the $10,863,762.01 to make payments and wire transfers to the benefit of Masters.

d.    After Molina demanded the return of her funds, assisting Masters in sending misleading emails to Molina and H&R, echoing Masters' promises that the funds would be returned, despite Goldstein's knowledge that the escrow account had been depleted.

e.    Allowing Masters to control the content of his communications with Molina and H&R. For example, on February 10, 2023, Masters drafted an email for Goldstein to send to H&R in response to their request for the return of Molina's funds, giving Goldstein instructions on how to reply. Then, on

February 14, 2023, Goldstein sent an email to H&R with nearly the same information Masters had provided.

96.     The combination of the above-referenced actions allowed Defendants to deprive Molina of at least $11,200,000.00.

97.     Because of Defendants' actions,  Plaintiffs have suffered damages of no less than $11,200,000.00.

98.     As co-conspirators, Masters, Goldstein, and Goldstein P.C. should be jointly and severally liable for each other's torts. *Marino*, 810 F. Supp. 2d at 610.

## COUNT VII – AIDING AND ABETTING FRAUD
### (Against the Goldstein Defendants)

99.     Plaintiffs re-allege paragraphs 12 to 55, and 61 to 68 as if set forth fully herein.

100.    The Goldstein Defendants knew of the fraud Masters was perpetrating on Molina.

101.    Goldstein, on his own behalf and on behalf of Goldstein P.C., aided Masters' fraudulent scheme to divest Molina of at least $11,200,000.00, by, among other things:

    a.    Entering into an escrow agreement with Masters and the Masters Entities. Pursuant to this agreement, Goldstein agreed to conduct any transfers of money from the funds deposited into the Citibank escrow account as instructed by Masters.

    b.    Receiving and retaining the $10,863,762.01 that Masters caused 7LF to wire to the Citibank escrow account between December 1 and 8, 2022.

    c.    Using the $10,863,762.01 to make payments and wire transfers to the benefit of Masters.

d.      After Molina demanded the return of her funds, assisting Masters in sending misleading emails to Molina and H&R, echoing Masters' promises that the funds would be returned.

e.      Allowing Masters to control the content of his communications with Molina and H&R. For example, on February 10, 2023, Masters drafted an email for Goldstein to send to H&R in response to their request for the return of Molina's funds, giving Goldstein instructions on how to reply. Then, on February 14, 2023, Goldstein sent an email to H&R with nearly the same information Masters had provided.

102.    For the Goldstein Defendants, it was foreseeable that aiding Masters in his suspicious activity and failing to exercise due diligence with respect to the escrow services provided to Masters would result in injury to Molina.

103.    Because of the Goldstein Defendants' actions,  Plaintiffs have suffered damages of no less than $11,200,000.00.

## COUNT VIII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Goldstein Defendants)

104.    Plaintiffs re-allege paragraphs 12 to 60 as if set forth fully herein.

105.    The Goldstein Defendants knew Masters was breaching his fiduciary duties to Molina.

106.    Goldstein, on his own behalf and on behalf of Goldstein P.C., aided Masters' breach of his fiduciary duties, by, among other things:

a.      Entering into an escrow agreement with Masters and the Masters Entities. Pursuant to this agreement, Goldstein agreed to conduct any transfers of

money from the funds deposited into the Citibank escrow account as instructed by Masters.

b.  Receiving and retaining the $10,863,762.01 that Masters caused 7LF to wire to the Citibank escrow account between December 1 and 8, 2022.

c.  Using the $10,863,762.01 to make payments and wire transfers to the benefit of Masters.

d.  After Molina demanded the return of her funds, assisting Masters in sending misleading emails to Molina and H&R, echoing Masters' promises that the funds would be returned.

e.  Allowing Masters to control the content of his communications with Molina and H&R. For example, on February 10, 2023, Masters drafted an email for Goldstein to send to H&R in response to their request for the return of Molina's funds, giving Goldstein instructions on how to reply. Then, on February 14, 2023, Goldstein sent an email to H&R with nearly the same information Masters had provided.

107.  Because of the Goldstein Defendants' actions, Plaintiffs have suffered damages of no less than $11,200,000.00.

## COUNT IX – NEGLIGENCE
### (Against the Goldstein Defendants)

108.  Plaintiffs re-allege paragraphs 12 to 55 as if set forth fully herein.

109.  The Goldstein Defendants were required to exercise that degree of skill commonly exercised by a member of the legal profession. *See Darby & Darby, P.C. v. VSI Int'l, Inc.*, 739 N.E.2d 744, 746 (N.Y. 2000).

110.  The Goldstein Defendants breached that duty by, among other actions:

21

a.   Not conducting due diligence efforts on Masters or the Masters Entities at the time of opening the Citibank escrow bank account, and thereafter.

b.   Failing to communicate with the authorities regarding Masters' actions damaging Molina.

c.   Retaining the $10,863,762.01 that Masters caused 7LF to wire to his escrow account between December 1 and 8, 2022.

d.   Using the $10,863,762.01 to make payments and wire transfers to the benefit of Masters.

e.   Assisting Masters in sending misleading emails to Molina and H&R, echoing Masters' promises that the funds would be returned.

f.   Not having a compliance program, nor any written policies, procedures, or controls to detect and deter fraud.

111.   Goldstein blindly obeyed Masters and dissipated Molina's funds at his direction.

112.   As a direct and proximate cause of the Goldstein Defendants' conduct, Plaintiffs have suffered damages of no less than $11,200,000.00.

113.   Had the Goldstein Defendants exercised the degree of skill commonly exercised by members of the legal profession, they would not have dissipated Molina's funds.

114.   For the Goldstein Defendants, it was foreseeable that neglecting the duties of a member of the legal profession with respect to the escrow services provided to Masters would result in injury to Molina.

## COUNT X – VICARIOUS LIABILITY
### (Against Goldstein P.C.)

115.   Plaintiffs re-allege paragraphs 12 to 55, and 108 to 114 as if fully set forth herein.

116.    In New York, a professional corporation may be held vicariously liable for the tort of its agents committed within the scope of the corporation's business. *Monir v. Khandakar*, 30 A.D.3d 487, 489 (N.Y. App. Div. 2006).

117.    Goldstein was an agent of Goldstein P.C. during the time in which Goldstein's actions contributed to the dissipation of Molina's funds.

118.    Goldstein's actions arose either within the apparent scope of his relationship with Goldstein P.C., or in furtherance of Goldstein P.C.'s interests.

119.    As a direct and proximate cause of Goldstein's conduct, Plaintiffs have suffered damages of no less than $11,200,000.00.

## **REQUEST FOR RELIEF**

120.    **WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Defendants, granting the following relief:

     a.    An award of damages of no less than $11,200,000.00, corresponding to Plaintiffs actual damages;

     b.    Prejudgment interest at the rate of 9% per annum, consistent with N.Y. C.P.L.R. § 5004(a);

     c.    An additional award of punitive damages to be determined at trial;

     d.    Any other relief the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

DATED: December 23, 2024        **Respectfully submitted,**

DIAZ REUS & TARG, LLP
100 Southeast Second Street, Suite 3400
Miami, Florida 33131
Telephone: (305) 365-9220

By: */s/ Javier Coronado Diaz*
Javier Coronado Diaz (New York Bar No. 5584842)
Attorney Email: jcoronado@diazreus.com
Michael Diaz, Jr. (Florida Bar Number:  606774)
Attorney Email: mdiaz@diazreus.com
(*Motion for Pro Hac Vice Admission Pending*)
Gabor Gazso von Klingspor (Florida Bar No. 1058977)
Attorney Email: ggazso@diazreus.com
(*Motion for Pro Hac Vice Admission Pending*)

*Counsel for Plaintiffs*